UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SAMUEL MCNEAR,

                          Petitioner

-vs-

VICTOR HERBERT,

                          Respondent.

_____

DECISION AND ORDER

02-CV-6033 CJS

APPEARANCES

For the Petitioner:         Samuel McNear, Pro se
                              98-B-0062
                              Clinton Correctional Facility
                              P.O. Box 2001
                              Dannemora, New York 12929

For the Respondent:      Office of the New York State Attorney General
                              Gary M. Levine, Esq., Assistant Attorney
                              General, Of Counsel
                              144 Exchange Boulevard, Suite 200
                              Rochester, New York 14614

INTRODUCTION

Samuel McNear ("Petitioner") was convicted in Genesee County Court, State of New York, of Rape in the First Degree, Sexual Abuse in the First Degree, Rape in the Third Degree, Sodomy in the Third Degree, Attempted Sodomy in the First Degree, and Attempted Rape in the First Degree. Petitioner, proceeding *pro se*, now seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, vacating those convictions. For the reasons that follow, the application is denied and this action is dismissed.

1

BACKGROUND

The instant case began when three teenage girls, all under the age of seventeen, accused petitioner of sexually assaulting them in separate incidents in February 1997 in the City of Batavia, New York.  CM alleged that on February 23, 1997, petitioner sodomized her and had sexual intercourse with her in the back of a parked car, and then later the same night had sexual intercourse with her at the home of Deborah Dacey ("Dacey").  KF alleged that on February 25, 1997, petitioner forcibly raped her in a parked car.  BB alleged that on February 27, 1997, petitioner sexually assaulted her and attempted to have sexual intercourse with her.  On March 28, 1997, a Grand Jury in Genesee County returned Indictment No. 3920, charging Petitioner with the following crimes: Sexual Abuse in the First Degree, Attempted Rape in the First Degree, Attempted Sodomy in the First Degree, Rape in the First Degree, Rape in the Third Degree (three counts), and Sodomy in the Third Degree.

The Honorable Robert C. Noonan, Genesee County Court Judge ("Judge Noonan"), arraigned petitioner on April 3, 1997, and set bail at $50,000.00, cash or bond.  Petitioner was represented by the Office of the Genesee County Public Defender.  Gary Horton ("Horton"), the Genesee County Public Defender, who had twenty years of experience practicing law[1], and  who had already been representing petitioner on some of the charges contained in the indictment in Batavia City Court, undertook to continue his assigned representation of petitioner.  At all relevant times, the People of the State of New York were represented by Lawrence Friedman,

---

[1]Transcript of April 10, 1997 appearance, p. 14.

Assistant District Attorney ("Friedman").[2]

Counsel and petitioner appeared before Judge Noonan on June 2, 1997, for argument of omnibus motions.  Horton noted at that time that, although the People had provided him with "some medical reports concerning the victims," the reports appeared to be incomplete, and he requested that Friedman provide additional information regarding testing for sexually transmitted diseases ("STD") done on one of the complainants, CM.  Horton was seeking this information, because a police report indicated that on March 15, 1997, KF and CM told a Batavia police officer that they each had contracted a sexually transmitted disease from petitioner.  Friedman provided the requested information.  Test results dated March 4, 1997 showed that KF had chlamydia. See, Pet. Memo of Law [#10], attached test result.  CM's test results, dated March 17, 1997, were negative for chlamydia, syphilis, and gonorrhea.  However, the medical notes accompanying the test results indicate that the viral culture was "neg - poor sample."  The notes further indicate that CM was diagnosed with PID [pelvic inflammatory disease] and prescribed medications for that condition on March 15, 1997.  More specifically, the notes indicate that, on March 15, 1997, CM had abdominal tenderness and a moderate amount of yellow vaginal discharge, which the doctor noted as "probable early PID."  A follow-up note dated March 17, 1997 states, under the heading "current medications," "Doxy [doxycycline]  for PID," and further states, "resolving PID much less tender today." Pet. Memo of Law [#10], attached exhibits.

Counsel and petitioner appeared before Judge Noonan again on July 24, 1997.

---

[2]Genesee County District Attorney David Gann appeared for the People at petitioner's arraignment on the indictment.

At that time, Judge Noonan scheduled trial for September 17, 1997.  Judge Noonan

noted that he expected the case to last three or four days.  Horton and petitioner

objected to a September 17th trial date in the following exchange:

> MR. HORTON:  We are still in the process of interviewing and in fact
> locating some witnesses.  I am somewhat uncomfortable with that early of
> a trial date and my client is very uncomfortable with that early of a trial
> date.
>
> THE COURT : How comfortable is your client with a 1998 trial date, that's
> the problem.
>
> MR. MCNEAR: Fine.
>
> MR. FRIEDMAN: You Honor, we're talking about six weeks from now.
> You're not talking about starting the trial next week.
>
> MR. HORTON: I understand that, Your Honor.
>
> ***
>
> THE COURT: Well, do you want to tell me, I won't make you make a
> formal motion but I guess I would like to know what it is that prohibits you
> from being ready for trial.
>
> MR. HORTON: There are a number of witnesses that we have been in the
> process probably over the past month of attempting to locate and
> interview.  We are about a third of the way through that list which is –
>
> MR. MCNEAR: We got two out of 33.
>
> MR. HORTON: Which at this point contains 29 witnesses and I'm not
> saying there are going to be 29 witnesses at trial but these are people we
> have to talk to before being ready for trial.
>
> ***
>
> THE COURT: Is there any reason why in the eight weeks between now
> and September 17 you couldn't be ready?  Your client . . . has expressed
> strongly while we've been sitting here his desire to have the matter
> adjourned and he's . . . [said] that only two of 33 witnesses he wants
> interviewed have been interviewed, but it is eight weeks away and the
> interviews will presumably not be done by yourself personally.
>
> MR. HORTON: I'm just not certain at this point, Your Honor.  I would
> rather raise the issue now than schedule a trial date and come back to

4

you in four weeks and say we're not going to be ready.

MR. MCNEAR: Can we schedule it tentative the seventeenth?  If we ready, then we go, but if we're not, then –

MR. HORTON: As I understand this court has to control its calendar as well.

THE COURT: Unfortunately I'm learning that this court has, when the cases get old this court has very limited control over it without being, you know, questioned from the administrative judge, so I'm going to order it up for September 17 for jury selection.

The next appearance in the case was on August 15, 1997.  At that time, Horton again expressed concern over the September 17th trial date, because another case which he was handling ("the Cole case") had subsequently been scheduled for trial on September 22nd.  Judge Noonan informed counsel that the judge presiding over the Cole case was adjourning that trial into October, and that petitioner's trial would remain scheduled for September 17th.  Specifically, the Cole trial was scheduled to begin on October 6th, three weeks after petitioner's trial.  Horton then raised another concern, which was that he had "limited resources" and would be preparing for Petitioner's trial and the Cole trial simultaneously.  Thereafter the following exchange took place:

THE COURT: Are you saying that because of your efforts on the Cole case, you're going to be unready for this case or because of your efforts on this case you are –

MR. HORTON: I'm saying that both cases require a great deal of resources from my office, from me personally, from my limited investigative capability and I don't think it's being fair to Mr. Cole or Mr. McNear.
                                        ***
MR. FRIEDMAN: Well, Your Honor, it's not like we're being ordered to start this trial immediately.  We're talking about a date that's five weeks away.  And this is not a new indictment and the court has just indicated that apparently Mr. Horton is going to have a couple more weeks than he had anticipated on Cole. . . . .

5

***

MR. HORTON: Your Honor, Mr. McNear . . . wants me to specifically point out that the investigation of his case at this point other than through my own efforts is being conducted by the investigator for the public defender's office who is Mary France who has obviously responsibilities other than Mr. McNear's case including treatment intakes and referrals for all clients for the public defender's office, intakes for all jail cases for the public defender's office, and investigative functions for certainly not all the cases in the public defender's office but a number of cases other than Mr. McNear's.

THE COURT: All right.  I understand that.  On the other hand as I've expressed before, I'll express again, if I don't try this case on the date that I scheduled some time ago which is still four weeks hence, it's going to be November which is with the defendant in custody is just not the right way to approach this case, so I have no alternative but to keep the trial date. I'm not saying I won't hear your motions with specific facts that are specific to this case why you can't be ready.  I don't want to hear . . . the fact that Mary France is involved in other matters or that the Cole case is in the wings because those are going to be factors that are always going to be true in every case.

MR. HORTON: Yes, Your Honor.

THE COURT: But if you have specific reasons why you can't be ready on this case, I'll be glad to hear your written motion on it.

MR. HORTON: And I intend to do that, Your Honor . . . .

MR. MCNEAR: I would like to address the court.  It seems like the court is urged by some other reasons unknown to try the case and I understand there's a necessity to try the case but again I reiterate with the limited resources and with the, respecting the limited resources of the public defender's office, with respect to the fact that Mary France is technically a new investigator[3] and solely the only investigator within the public defender's office, I request that the court recuse itself from the case.

THE COURT: You want me to recuse myself because the public defender's office has a new investigator?

---

[3]Although France was "new" to the public defender's office, she was not new to the criminal justice system, having worked as a probation officer for over eight years. Transcript of May 16, 2000 appearance, p. 92.

6

MR. MCNEAR: No, because the court, because of your urgent, it seems like you have some personal urge to move the case quickly, all right, in spite of my right to have a proper investigation conducted, all right.  As noted previously in our last court appearance there's a number of 33 witnesses.  Only three witnesses have been interviewed, all right.  There are several, several major cases pending at this time within this county, okay, and, you know, Gary, my attorney has sought consideration on the court's part and the court refuse and it just seems personal, it seems like it's a personal issue.

THE COURT: There's nothing personal, Mr. McNear.  I'll just tell you this case will have been pending , the indictment will have been pending for about six months when the case comes up for trial and the case was pending for some time with the public defender's office before that.  Let me tell you another alternative, I'm going to be pretty firm on this trial date, [but] before [the Public Defender's Office] had [its] own investigator you often made ex parte applications to the court for investigative resources.  I will certainly entertain an application to assist you in preparing for trial.

MR. HORTON: Your Honor, I'm certainly aware of that but . . .  because we are a county funded office that's a budgetary matter.  In other words what I'm saying so Mr. McNear is clear on that as well, I have a limited budget.  I can go back and ask for more money without going to the court but –

THE COURT: I don't think you can have it both ways.  You can't say I need investigation done, this is a very important case with a possible [in effect] life sentence in the balance but I'm not willing to devote my office's resources to that investigation, you can't have it both ways.

MR. HORTON: All I'm indicating is that I think procedurally I would have to utilize my entire budget which is very close to being true for this year and ask for additional funding from the legislature before asking for an order from the court.

MR. MCNEAR: Judge –

THE COURT: All right, I'll let you decide.  The only thing, Mr. McNear, I would prefer since you have not been granted co-counsel status that Mr. Horton has not asked for that status for you that you submit any information to me through Mr. Horton.  Is there any request otherwise, Mr. Horton?

MR. HORTON: Not at this time, Your Honor.  If there is, we'll make that at the same time we make our application concerning the trial date.

7

Following these comments, Petitioner noted for the record that he was willing to waive his speedy trial rights.

Horton subsequently filed a written application to adjourn the trial date, which was argued on September 5, 1997.  During argument of the motion, Horton noted that, after the last court appearance in the case, he had assigned an Assistant Public Defender in his Office, Mr. Andersen, to represent petitioner at trial, and that a few days later Andersen had become unable to try the case due to personal and family reasons. Horton had then arranged to have a private defense attorney, D. Michael Murray, Esq. ("Murray"), represent petitioner at trial.  Horton then again requested that petitioner's trial be adjourned until after the Cole trial.  Judge Noonan denied the request to adjourn the trial, but approved the substitution of Murray as counsel.  Judge Noonan also reiterated that he was willing to approve any request for additional investigative services. (Transcript of September 5, 1997 appearance, pp. 2-10).

Subsequently, Murray reviewed the case, met with petitioner, and arranged to meet with petitioner again to prepare for trial.  However, during the weekend before the trial was to begin, Murray and petitioner had a disagreement that led Murray to seek to withdraw from the case.  The dispute between Murray and petitioner arose from two separate incidents.  First, Murray alleged that petitioner arranged to have someone posing as a member of Murray's staff call the jail and request certain information. Second, Murray alleged that petitioner refused to meet with him to prepare for trial, because petitioner was angry that he had not come to the jail sooner in the day.  The following day, Monday September 15, 1997, Murray filed a motion to be relieved as counsel.  On the morning the trial was scheduled to begin, Wednesday, September 17,

8

1997, Murray appeared before the court, and reiterated that he was unwilling to represent Petitioner. Petitioner denied that he had directed anyone to impersonate a member of Murray's staff, or that he had refused to meet with Murray. However, petitioner stated that he did not want Murray to represent him. Transcript of September 17, 1997 pp. 7-8, 10-11, 17-18. Petitioner further stated that he did not care who represented him, but he was concerned about a perceived lack of trial preparation. *Id*. at 9. Petitioner also suggested that Judge Noonan was somehow preventing him from investigating his defense, to which Judge Noonan replied:

> THE COURT: . . . I have never denied any application for investigative services on this case nor would I. Mr. Horton has his own budget. The assigned counsel plan and the attorneys who take assignments through it know how to make application for investigative services and I haven't looked at your file to see if I signed and order in this case but I haven't refused to sign an order. If anyone has asked for investigative services, I have granted it. If anyone has not asked, that's a defense strategy I don't have any control over.

*Id*. at 22. Petitioner further stated that he did not wish to proceed *pro se*, and refused to answer Judge Noonan's questions concerning his ability to proceed *pro se*. *Id*. at 25-31, 37-39, 43. Petitioner then asked Judge Noonan to allow him to check to see if an attorney who was representing him on a separate criminal matter in another court would be willing to represent him in the instant case. *Id*. at 14. Judge Noonan then allowed petitioner time to call various attorneys, but none of them were willing to take over his defense on the eve of trial. *Id*. at 50.

Judge Noonan then explored the possibility of re-assigning Horton's office to represent petitioner. However, Horton stated that he would object to being forced to proceed to trial as scheduled, since his office was also preparing for the Cole trial,

scheduled to begin approximately three weeks later, on October 6, 1997. *Id*. at 51-52.

Horton requested that the trial of petitioner's charges be adjourned until one week after

the conclusion of the Cole trial. *Id*. at 55.  The prosecutor opposed any attempt to delay

petitioner's trial, citing his concern that petitioner had attempted to bribe witnesses in

the case. *Id*. at 53-54.

Judge Noonan reassigned Horton to represent petitioner, and denied the request

for an adjournment, opining that "there may be good reason to think that Mr. McNear's

strategy has been to try to obtain an adjournment of the case." *Id*. at 56.[4]  Judge

Noonan further noted that he believed that Horton would have "more breathing room" to

try petitioner's case before the Cole trial, instead of after, and further, that petitioner's

case was "the oldest case on the calendar right now." *Id*. at 58.  Judge Noonan further

found that, contrary to petitioner's assertions, the defense had adequately investigated

the case.  In that regard, Judge Noonan stated:

> THE COURT:  I guess I should also place on the record something that
> was discussed in chambers and that was the investigation aspect.  Of
> course your office [the Public Defender's Office] has been involved in the
> case for I don't know how much before but certainly since indictment the
> last six months or so that there has been an on-going investigation.  I
> know you [Horton] indicated there are one or two witnesses that you were
> having difficulty locating and which is not uncommon when you're looking
> for a large number of people, but there are contrary to Mr. McNear's belief
> that there has been an on-going investigation on this case and it hasn't
> been neglected to the extent that Mr. McNear has set forth on the record.
>                                      ***
> THE COURT: Also I guess maybe I should ask this, Mr. Horton, has there
> ever been any request to your knowledge for investigative services of any
> kind that I did not grant?

---

[4]Judge Noonan directed that jury selection would take place on Thursday, September 18th, with
the introduction of proof to begin on Friday September 19th.

MR. HORTON: Not from our office, Your Honor, and again that's administratively we have an investigator on staff and a budget for outside investigators if necessary.

THE COURT: Okay, so you wouldn't have to seek an order of the court in order to get investigative services?

MR. HORTON: No, Your Honor.

*Id*. at 62-63.  As discussed further below, Horton later testified that he did not need to seek additional investigative help with plaintiff's case because he had assigned the public defender's staff investigator, France, to work exclusively on petitioner's case, and had hired an outside investigator to work on the Cole case.  Judge Noonan also noted, based upon representations from Horton, that three attorneys from the Public Defender's office, including Horton, would assist at trial.

Prior to the start of the trial, the defense sought permission to use certain evidence to impeach BB's credibility.  Specifically, defense counsel stated, based upon second-hand hearsay, that he believed that there were records establishing that on three occasions, BB had made a complaint of sexual assault, and then "recanted" the complaint. Trial Transcript 295-96.  The prosecution denied the assertion. *Id*. at 297. Judge Noonan directed that the alleged records be provided to him for an *in camera* review, since they were sealed juvenile records.  After reviewing the records, Judge Noonan ruled as follows:

[I] have reviewed in camera certain records produced by the City of Batavia Police Department in connection with the defense motion for subpoena of records allegedly including false or recanted allegations of sexual contact or rape by one of the three complainants in this case. Having reviewed those records I find that none of the records produced are or disclose any false or recanted allegations of sexual contact or rape and I decline to produce the records since whatever is included in them would be precluded by section 60.42, the rape shield statute.

11

Trial Transcript 425.  Horton responded that he wanted to question BB outside the presence of the jury, about any prior complaints of sexual assault that she might have made.  In that regard, Horton admitted that he had no reason to believe that BB had made false complaints, but he wanted to ask her why the individuals named in her complaint had not been prosecuted. *Id*. at 429-31.  When asked what information he had in that regard, defense counsel stated, "What I have, Your Honor, is very little except for the fact of an indication whatever accusations were made never went before any court." *Id*. at 430.  Judge Noonan denied the request.

Following jury selection, the prosecution began to present its case on the afternoon of Friday, September 19th.  The first prosecution witness was KF, age 15.  KF testified that on February 25, 1997, after petitioner offered to give her a ride to a friend's house, he had forcible sexual intercourse with her in a parked car in the City of Batavia. When the defense asked her why she had initially remained in the car with petitioner, after he stopped the car in a deserted parking lot, KF stated that she did not want to get out and walk because it looked like it was going to rain.  After KF testified, the court stood in recess for the weekend.

The trial resumed on Monday, September 22, 1997.  The second prosecution witness was CM, who testified that on the early morning of February 23, 1997, shortly after midnight, when she was sixteen years old, petitioner had sexual intercourse with her in a car, and also performed oral sex on her. Trial transcript 372-73.  CM further testified that petitioner had sexual intercourse with her again an hour or so later at the home of Dacy, where the two were spending the night. The third prosecution witness was BB, who testified that on February 27, 1997, while she was age fifteen, petitioner

12

attacked her at the house of a friend and attempted to have forcible intercourse with her. Specifically, BB testified that petitioner grabbed her from behind, threw her on a bed, and used his mouth and penis to have sexual contact with her through her pants. She testified that petitioner then pulled her pants down, and she kicked him and attempted to get away, but he grabbed her and threw her onto the bed again. Trial Transcript at 445-49. After BB continued to resist, petitioner let her go and she left the house. An hour or so later, after talking with her boyfriend Willie Shannon ("Shannon"), she reported the incident to the police. The fourth and final prosecution witness was Charles Dudek, a detective with the Batavia City Police Department. Dudek testified that he interviewed petitioner on March 2, 1997, and petitioner admitted that he had been in the house with BB on February 27, 1997, but he denied having any sexual contact with her. Trial Transcript 506. Dudek testified that when he asked petitioner why the complainants would accuse him of sexually assaulting them, petitioner responded, "Maybe its because I may be involved in drugs." Trial Transcript 507.[5]

The defense began its case on Tuesday, September 23, 1997. The first defense witness was Shaquima[6] Murphy ("Murphy"), who attempted to provide an alibi for petitioner in connection with the charges involving CM, which occurred on February 23, 1997. Murphy testified that petitioner was with her at her apartment in LeRoy, New York, on the weekend of February 22-23, 1997. Trial Transcript 526. Murphy testified that LeRoy is a ten to fifteen minute drive from Batavia. Murphy testified that petitioner

---

[5]According to Dudek, petitioner had actually stated that it might be because he was involved in selling drugs, however to avoid prejudice to petitioner, Judge Noonan directed, outside the presence of the jury, that Dudek omit the reference to selling drugs.

[6]In the transcript Murphy's named is spelled both as Shakeema and Shaquima.

came to her apartment at about 8:00 pm on Saturday, February 22nd, then left to go out at 10:00 pm, and did not return until approximately 1:00 am on Sunday, February 23rd. Trial Transcript 527. She further testified that petitioner stayed at her apartment until approximately 1:00 or 2:00 pm on the 23rd. On cross examination, Murphy admitted that a month prior to the trial, she had told a defense investigator and a police officer that she could not remember which weekend it was that petitioner had been at her apartment.

The next defense witness was Donna Luh, the manager of the Genesee County Airport, who testified regarding the weather conditions on February 25, 1997, the day that petitioner allegedly raped KF. Luh testified that airport staff checked the weather once each day, at 3:00 pm, and recorded the observations in writing. Luh testified that the record made on February 25, 1997, showed no precipitation. The defense sought to introduce that information, because, as discussed above, KF had testified that it appeared that it was going to rain that evening. The third and final defense witness was Willie Shannon, who as mentioned above was BB's boyfriend. Shannon testified that he saw BB shortly after she was attacked by petitioner, and that she seemed "hysterical." Shannon stated that BB told him that petitioner had raped her a short time earlier. Trial Transcript 576-77, 58-81. Defense counsel attempted to elicit testimony that the alleged attack by petitioner had occurred later in the day than BB had testified, however, Shannon was not sure of the exact time that the assault had taken place. Following Shannon's testimony, the defense rested.

Petitioner did not testify in his own defense. In that regard, Judge Noonan had ruled prior to trial that the prosecution could use evidence that plaintiff had twice

14

attempted to bribe witnesses in the case.  Petitioner also had an extensive criminal

record, including convictions for Attempted Rape in the First Degree (guilty plea in

satisfaction of two counts of Rape in the First Degree), Attempted Promoting Prison

Contraband in the First Degree, Attempted Burglary in the Second Degree, Criminal

Possession of a Controlled Substance in the Seventh Degree (3 separate convictions),

and Criminal Possession of Stolen Property in the Fifth Degree. *See*, Respondent's

Answer [#6], Ex. 1, pp. 136-37.

During closing arguments, Horton argued that the prosecution's case consisted

solely of the complainant's testimony, and that they were lying about all of the

incidents.[7]  After deliberating, the jury convicted petitioner of all counts of the

indictment.  Judge Noonan sentenced petitioner on December 17, 1997, as a second

violent felony offender, to a total aggregate indeterminate sentence of 42 to 44 years, to

run consecutively to an unrelated three-year prison term.

Petitioner appealed to the New York State Supreme Court, Appellate Division,

Fourth Department, which affirmed the convictions on October 1, 1999. *People v.*

*McNear*, 265 A.D.2d 810 (4th Dept. 1999). The Appellate Division assigned Anthony

Irrera, Esq. to represent petitioner on appeal on February 18, 1998.  However, on July

---

[7]During the prosecutor's closing argument, he stated that the defense had focused on the fact that "there was only two people present" when the alleged crimes took place, and he told the jury that, "on each of these charges you've heard from one of those people with respect to what happened." Trial Transcript 612.  Defense counsel objected that the prosecutor was urging the jury to draw a negative inference from the fact that the defendant did not testify. *Id*. at 612-13.  The Court found that the prosecutor had not done so, but warned him to avoid the issue during the rest of his closing argument. During his instructions to the jury, Judge Noonan instructed the jury that it could not draw any unfavorable inference from the defendant's decision not to testify. *Id*. at 641.  As discussed below, petitioner originally argued, as part of his habeas petition, that he was entitled to a new trial based upon prosecutorial misconduct, however he later abandoned that argument.

9, 1998, David Pajak, Esq., was substituted as Appellate Counsel.  On Appeal, petitioner raised the following issues: 1) Judge Noonan erred by failing to suppress petitioner's statement to Detective Dudek; 2) Judge Noonan erred by failing to adjourn the trial to allow the defense additional time to investigate; 3) there was insufficient evidence of statutory rape of KF; 4) there was insufficient evidence of forcible rape of KF; 5) the complainant's testimony was not credible; 6) Judge Noonan gave an erroneous jury instruction; 7) the prosecutor committed misconduct by drawing attention to plaintiff's decision not to testify; and 8) the sentence was excessive.  In affirming the convictions, the Appellate Division found no error in Judge Noonan 's decision to deny an adjournment of trial.  Noting that the decision was within the trial court's discretion, the Appellate Division stated that, "[i]n view of the Public Defender's previous involvement with the case, the reassignment to the Public Defender the day before jury selection did no hamper the defense, nor did the fact that two Assistant Public Defenders conducted some parts of the trial."  Petitioner subsequently sought and was denied leave to appeal to the New York State Court of Appeals.

Plaintiff, proceeding *pro se*, filed a motion pursuant to New York Criminal Procedure Law ("CPL") § 440 on or about March 12, 1998, on the grounds of ineffective assistance of counsel.  Primarily, Petitioner alleged that Horton had failed to present a proper defense using alibi witnesses.  Petitioner also complained again about Judge Noonan's decision not to grant an adjournment of the trial.  In connection with those arguments, petitioner referred to the 6th and 14th Amendments of the U.S. Constitution. Judge Noonan denied the motion without a hearing.  With regard to defense counsel's performance, Judge Noonan wrote:

> [A] review of the proceedings confirms that the Public Defender's Office
> made timely and proper motions, requested and competently conducted a
> suppression hearing, advanced an alibi defense to the extent
> demonstrable, vigorously cross-examined the People's witnesses, and
> made the appropriate arguments to the jury.  It cannot be concluded
> therefrom that counsel either performed so incompetently that there is a
> probability of prejudice to the defense, or, under the totality of the
> circumstances, failed to provide a meaningful representation.

Answer, Ex. 8.  Plaintiff requested leave to appeal the denial of the 440 motion to the

Appellate Division, Fourth Department, on or about July 16, 1998.  The Appellate

Division denied leave to appeal on October 28, 1998.  Pursuant to New York Criminal

Procedure Law § 450.90(1), plaintiff could not appeal to the New York Court of

Appeals.

Petitioner filed a motion to "renew" his CPL § 440 motion on or about March 1,

1999, on the basis of newly discovered evidence.  The purported new evidence was

affidavits from Kelvin Robinson, Anthony Largent, and Amanda Gillette.  According to

petitioner, these witnesses would have provided him with an alibi with regard to the

charges involving KF.  More specifically, petitioner stated that they "would have testified

during trial, on behalf of the defense, that they had contact with, observed and spoke

directly to the defendant, Samuel L. McNear, on February 25, 1997, in Batavia and

Rochester, New York.  Hence, at the time making it virtually unlikely and impossible an

opportunity would have sufficed for the commission of the crime."  In his affidavit, Kelvin

Robinson stated that on February 25, 1997, at about 5:30 P.M. in the City of Rochester,

he saw petitioner and "three caucasian white females."  As discussed above, petitioner

was convicted of raping KF in Batavia at that time on February 25th.  Anthony Largent's

affidavit was essentially identical to Robinson's.  Amanda Gillett's affidavit stated that

17

on February 25, 1997, at "about 4:15 P.M.," she observed petitioner, Bonnie Reed ("Reed"), [CM], and [KF], leave Batavia to travel to Rochester by car.

Judge Noonan scheduled a hearing which began on December 17, 1999, and continued on February 4, 2000, May 16, 2000, and June 1, 2000. Petitioner, Robinson, and Gillett testified at the hearing. Also testifying were Horton, Murray, Anderson, France, and Thomas Burns ("Burns"), an assistant public defender in Horton's office.[8] Neither petitioner nor his attorney could locate Largent to testify at the hearing. In that regard, petitioner's attorney stated that he and two separate investigators had been unable to locate Largent. June 1, 2000 Transcript at 59-60.

Horton testified that, in preparing for petitioner's trial, his investigator, France, had interviewed defense witnesses though he did not recall who France interviewed. In this regard, Horton was testifying from memory two years after the fact. Horton testified that he recalled Gillett's name in connection with the case, but did not recall Largent's. Horton further indicated that although he had previously represented Kelvin Robinson, he did not recall Robinson being involved in petitioner's case. Horton remembered that petitioner had provided names of certain witnesses who could not be located. For example, Horton remembered that Leland Marsceill, a potential witness who supposedly could have provided an alibi for petitioner as to one of the three incidents,

---

[8]Burns, Andersen, and Murray had very little information concerning petitioner's application. Burns testified that in preparing for petitioner's trial, he included Anthony Largent's name on a list of potential witnesses, but he did not remember why. Murray testified that he did not recall discussing alibi witnesses with Horton, and didn't personally do any investigation during the brief period he represented petitioner. Similarly, Andersen testified that he was only involved with petitioner's case for a few days and didn't recall what, if anything, he did as far as investigation. February 4, 2000 Transcript at 46-50.

could not be located.[9]  Horton said that petitioner suggested several alibi witnesses

over a period of time, but the witnesses did not support petitioner:

> Q. Okay. . . .  With regards to the alibi notice . . . did you at any time make
> any, did my client inform you of these names I mentioned, Anthony
> Largent, Kelvin Robinson so that you could put in a notice, Amanda
> Gillett.
>
> A. Well, the names came up over a period of time.  They weren't all
> mentioned at one time, they were mentioned over a period of time.  And
> quite frankly, I'm not sure we filed an alibi notice or not.  I somewhat doubt
> we did because none of the people that we were able to talk to actually
> provided an alibi for the dates and times alleged.  And obviously the
> people we weren't able to locate we couldn't file notices.

May 16, 2000 Transcript at 22-23.  For example, Horton recalled that Gillett could not

provide an alibi for petitioner. *Id*. at 21.  Similarly, Horton stated that he did not call

Harvey Lockhart as a witness at trial because Lockhart had indicated that he would not

testify favorably to petitioner. *Id*. at 19, 23.  Horton testified that although he could have

sought additional investigative services for petitioner's case, he did not because he

believed that France was doing a good job. *Id*. at 17.  Horton stated that France was

devoting herself solely to petitioner's case, and that he hired an outside investigator to

work on the Cole case. *Id*. at 17-18.

France testified that, in preparing for trial, she talked with petitioner about his

case "almost everday." May 16, 2000 Transcript at 90.  France recalled that petitioner

had told her that he had been in the town of LeRoy on February 23, 1997 and in

Rochester on February 25, 1997. June 1, 2000 Transcript at 37-38.  As mentioned

above, Shaquima Murphy had testified at trial concerning petitioner's alleged presence

---

[9]As discussed further below, Leland Marsceill was never located to testify, either at the time of
trial, or two years later at the hearing in connection with petitioner's CPL § 440 hearing.

in Leroy on February 23rd.  As for the date of February 25th, France stated that petitioner

told her that he'd gone to Rochester with Reed, KF, and CM, and that along the way he

had tried to call the Batavia police department from Murphy's residence in Leroy and

from a pay telephone at a Wilson Farms convenience store.  *Id*. at 40-42.  France stated

that petitioner told her that before arriving in Rochester that day, he, Reed, KF, and CM

had stopped at the house of Leland Marsceill, in the Town of Chili.  France also

described how she came to interview potential defense witnesses in petitioner's case:

> Q. How many people do you think you investigated in this case?
>
> A. I really don't know.  I talked to quite a few people.  I spent most of the
> time looking for this Mr. Marsceill, went looking for where he lived in
> Chil[i], spent a lost of time looking for Bonnie Reed's sister, there was a lot
> of people I interviewed.  I couldn't tell you how many, maybe ten.  There
> was a few juveniles that I had interviewed later that I didn't have full name
> to, I was going by street names.
>
> Q. I take it, was Mr. McNear referring you to individuals that might have
> known the names of these people?
>
> A. Yes, again mostly he knew people by street names.  He didn't give me
> a piece of paper with full names.

May 16, 2000 Transcript at 94.  France testified that she did not recall hearing the name

Anthony Largent from petitioner.  France testified that although petitioner referred to

someone named Kelvin, he did not know Kelvin's last name. May 16, 2000 Transcript at

83-84.  France further stated that petitioner had provided the name Amanda, but did not

indicate a last name.  As a result, France interviewed someone named Amanda Body

before determining that Amanda Gillett was the correct witness.  *Id*. at 85-86.  France

said that she also attempted to locate other witnesses whose names were given to her

by petitioner, such as Leland Marsceill. *Id*. at 87.  France attempted to find Marsceill in

various ways, and eventually found an address where he had paid a utility bill, but never found him. June 1, 2000 Transcript at 47.  France also spoke to potential witnesses, such as Reed and Richard Shauf, the police officer who petitioner was allegedly trying to call on February 25th, but neither would cooperate with her. May 16, 2000 Transcript at 87-89.

Kelvin Robinson, a convicted drug dealer and forger who was serving time in state prison at the time of the hearing, initially testified at the hearing that he saw petitioner on Fulton Avenue in the City of Rochester on February 25, 1997 at around 5:00 or 5:30 pm. May 16, 2000 Transcript at 28, 32-34.  Robinson said that he was with Anthony Largent and Robinson's uncle, named Mike.  Robinson testified that petitioner had come to Rochester on February 25th to pick up crack cocaine from them. *Id*. at 43-44.  Robinson testified that he did not recall the date as being February 25th until a private investigator suggested that date to him two years later, and he admitted that he had no particular reason to recall what day it was. *Id*. at 38-41.  On cross examination, Robinson admitted that he could only say that it was sometime in February 1997 that he had seen petitioner. *Id*. at 41-42.

Amanda Gillett testified on two occasions during the course of the hearing.  On May 16, 2000, Gillett initially testified that she saw petitioner on February 25, 1997, at Reed's house at approximately 5:00 p.m.  She stated that petitioner, Reed, CM, and KF had then left to go to Rochester, and returned at about 11:00 p.m.  May 16, 2000 Transcript at 54-56.  However, on cross examination, Gillett stated that she "had no idea" what day this occurred. *Id*. at 62.  At petitioner's request, Judge Noonan allowed

Gillett to testify again on June 1, 2000.  Gillett again initially testified that she had seen petitioner going to Rochester with Reed, KF, and CM on February 25, 1997.  However, on cross examination, Gillett again admitted that she had no idea what day it was that this occurred.  In fact, Gillett testified that she could only remember that it was sometime in 1997, and that there had been snow on the ground. June 1, 2000 Transcript at 23-25.

Petitioner also testified at the hearing.  Petitioner stated that he believed that Horton and France had not properly investigated his alibi witnesses, particularly Gillett, Robinson, and Largent. June 1, 2000 Transcript at 91.  Petitioner testified that Horton told him that he couldn't investigate certain witnesses because he was too busy working on the Cole case. *Id*. at 75, 80-81.  Petitioner stated that he told France that she could locate Largent and Robinson through a Judy Walter, who was Largent's aunt.  Petitioner further testified that he told France that Robinson and Largent were being prosecuted in Rochester, and that she might be able to locate them through the Monroe County Public Defender's office. *Id*. at 77.   Petitioner also testified to his version of the events of February 25, 1997.  Petitioner testified that he Reed, CM, and KF drove from Batavia to Rochester, so that he could pick up crack cocaine from Kelvin Johnson and Anthony Largent. *Id*. at 70.  Regarding the telephone calls that petitioner claimed to have made to the Batavia police on February 25, 1997, petitioner testified that he stopped at the residence of Shaquima Murphy's father in Batavia, and began to call the police, but then hung up because he was afraid that the call would be traced and he'd be arrested:

We stopped off at Shaquima Murphy's residence *in Batavia, her father's*

22

> *residence anyway* and I responded to the police department.  Once I
> realized that I was still in Genesee County I immediately hung it up
> because I didn't want to be pursued by the police at that location under
> the belief that I was being pursued by the police department for other
> reasons.

*Id*. at 68 (Emphasis added).  Petitioner then testified that after hanging up the

telephone at the home of Shaquima Murphy's father in Batavia, he drove back onto the

expressway and proceeded directly to Rochester, without stopping along the way. *Id*. at

69.  The Court notes, as an aside, that this testimony contradicts petitioner's prior

factual allegations.  For example, petitioner previously claimed that he made the phone

call from Leroy, not Batavia. *See*, CPL 440 motion, ¶ ¶  18-21, Def. Answer Ex. 8.

Moreover, in his second CPL 440 application, petitioner claimed not only that he called

from Batavia, as opposed to Leroy, but that he actually spoke with police staff when he

placed the call from Batavia. Supplemental CPL 440 Motion ¶ 5, Def. Answer Ex. 9.

Even earlier in the hearing petitioner had indicated, several times, that he had made the

phone call in question from Shaquima Murphy's house in Leroy, not the home of

Murphy's father in Batavia. May 16, 2000 Hearing at 19-20; June 1, 2000 Transcript at

36-37, 42, 73-74.[10]  Moreover, if petitioner drove directly from Batavia to Rochester, that

would have precluded a stop in Leroy, which, the Court takes judicial notice, is between

Batavia and Rochester.  In any event, petitioner further stated that, on the way to

Rochester, he, Reed, CM and KF stopped at the house of Leland Marsceill.  Petitioner

states that although he wanted France to locate and interview Marsceill, he didn't know

---

[10]*See also*, Pet. Memo of Law [#10] p. 35: "The time indicating when and wherefrom [sic]
petitioner returned one call to [Batavia police officer Richard Shauf]  was also not pursued even though
petitioner had indicated that he had stopped at Murphy's house in Leroy when en route to Rochester and
called Shauf from Murphy's home."

Marsceill's first name and could only describe the house in general visual terms, without any house number or event a street name. *Id*. at 69.  Nonetheless, petitioner opined that France failed to properly investigate the case by failing obtaining phone records to substantiate his calls to the Batavia police and by failing to locate Marsceill.

Following the hearing, on September 29, 2000, Judge Noonan issued a Memorandum Decision and Order denying petitioner's renewed CPL 440 motion. Regarding Robinson, Judge Noonan found that Robinson's "testimony was so vague on when he had seen the defendant with three white females in Rochester, that he could not even pin it down to the day or week of the alleged crime, to say nothing of the accuracy within hours or minutes that would be required in order to establish the defendant's alleged alibi.  In addition, Robinson had an extensive criminal history and lacked general credibility."  Regarding Gillett, Judge Noonan stated that at the hearing she was "vague and uncertain of dates and times that she was with the defendant and would not have been an effective alibi witness in any event."  Judge Noonan further noted that, prior to the trial, France had spoken with Gillett, and as a result, the defense did not call Gillett to testify because "she did not support what the defendant indicated she would testify to."[11]  As for the efforts of the Public Defender's Office, Judge Noonan found that, despite the fact that they were simultaneously preparing for a murder trial,

> diligent efforts were made to locate and interview the witnesses suggested by the defendant, although at least one of the defendant's proposed witnesses was unable to be located.  In addition, defense counsel made the judgment that witness Bonnie Read would not have offered credible testimony in the defense of the case.  In addition, the Public Defender's

---

[11]After listening to their testimony at the hearing, Judge Noonan noted that neither Robinson or Gillett had "any clue" as to the dates that they saw petitioner. May 16, 2001 Transcript at 66.

Office did not obtain billing statements to attempt to corroborate the defendant's version of places he had been and telephone calls he had made as part of his alibi defense, since the telephone calls were made from unspecified pay phones.  As to Officer Richard Schauf of the Batavia Police Department, whom defendant asserted had been engaged in certain phone conversations, the Officer was interviewed by Investigator France and could not corroborate telephone calls at any times relevant to the defendant's purported alibi.

Overall, Judge Noonan concluded that petitioner's application had to be denied for two reasons:

[T]he Public Defender's Office diligently followed up in each and every instance on the witnesses suggested by the defendant and, to the extent that those witnesses were produced at the time of the hearing on this matter, their general credibility and factual specificity were such that their testimony would have been irrelevant and incredible in any event.  The defendant's testimony regarding his innocence and alibi, due to the extensive criminal history, was not credible nor would it have been credible before a jury.

Petitioner appealed Judge Noonan 's ruling to the Appellate Division, Fourth Department, on October 10, 2000.  The Appellate Division denied leave to appeal on March 31, 2001.  Petitioner sought leave to appeal to the New York Court of Appeals (on 4/24/01), citing ineffective assistance of trial counsel, however the Court of Appeals dismissed the appeal on April 27, 2001, pursuant to CPL § 450.90(1).

Petitioner filed an application for a writ of error coram nobis on or about September 5, 2001, alleging ineffective assistance of Appellate Counsel.[12]  Petitioner alleged that his appellate attorney should have argued that Judge Noonan's ruling precluding questioning concerning BB's prior complaints of sexual assault deprived him of a fair trial.  The Appellate Division denied the motion for writ of error coram nobis

---

[12]The application refers to the 5th, 6th, and 14th amendments to the US Constitution.

without further comment on November 9, 2001.  Petitioner sought permission to appeal

to the Court of Appeals, however the Court of Appeals dismissed the application on

December 3, 2001.

Petitioner filed the instant Habeas Petition on January 22, 2002.  The petition

[#1] purported to state seven separate grounds for relief: 1) ineffective assistance of

trial counsel, based on counsel's failure to challenge complainant's credibility with

medical records; 2) ineffective assistance of trial counsel, based on counsel's failure to

interview 29 potential defense witnesses; 3) denial of right to counsel and to a fair trial,

based on Judge Judge Noonan's refusal to adjourn the trial; 4) ineffective assistance of

trial counsel, based on counsel's failure to investigate possible alibi witnesses; 5) denial

of a fair trial, based on Judge Noonan's decision denying suppression of petitioner's

statements to Investigator Dudek; 6) ineffective assistance of appellate counsel, based

on counsel's failure to challenge on appeal Judge Noonan's ruling excluding evidence

of BB's prior complaints of sexual assaults; and 7) denial of fair trial based on

prosecutorial misconduct.  Petitioner subsequently withdrew the fifth and seventh

grounds listed above. *See*, Plaintiff's Letter to the Court dated August 12, 2003.  In

response to the petition, respondent argued, *inter alia*, that petitioner had failed to

exhaust his judicial remedies.  Thereafter, in his reply memorandum of law [#10],

petitioner raised only the following issues: 1) denial of right to a fair trial/effective

assistance of counsel by the trial court, based on the court's denial of an adjournment;

2) ineffective assistance of trial counsel, due to counsel's failure to investigate proposed

witnesses, and to impeach CM with medical reports; and 3) ineffective assistance of

appellate counsel due to counsel's failure to challenge the trial court's evidentiary ruling

excluding evidence of prior complaints of sexual assault by BB.

ANALYSIS

Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of

1996,("AEDPA"),

> a federal court cannot grant a writ of habeas corpus unless the state
> court's proceedings (1) "resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States," 28 U .S.C. §
> 2254(d)(1), or (2) "resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence presented
> in the State court proceeding," *id*. § 2254(d)(2).

*Davis v. Greiner*, — F.3d — , 2005 WL 2500690 at *5 (2nd Cir. 2005).  In this regard,

> [a] decision is contrary to clearly established Federal law if it contradicts
> the governing law or if the state court confronts a set of facts that are
> materially indistinguishable from a decision of the Supreme Court and
> nevertheless arrives at a result different from the Supreme Court.  An
> unreasonable application of federal law is more than an incorrect
> application, but the petitioner need not show that all reasonable jurists
> would agree that a state court determination is incorrect in order for it to
> be unreasonable.  Instead, a federal court should review a state court's
> interpretation of federal law using a standard of objective reasonableness.
> The increment of incorrectness beyond error need not be great;
> otherwise, habeas relief would be limited to state court decisions so far off
> the mark as to suggest judicial incompetence.

*Yung v. Walker*, 341 F.3d 104, 109 -10 (2d Cir. 2003).  Moreover,

> [i]n a proceeding instituted by an application for a writ of habeas corpus by
> a person in custody pursuant to the judgment of a State court, a
> determination of a factual issue made by a State court shall be presumed
> to be correct. The applicant shall have the burden of rebutting the
> presumption of correctness by clear and convincing evidence.

28 U.S.C.A. § 2254(e)(1).

Exhaustion

A petitioner must exhaust his judicial remedies with regard to each claim that he seeks to assert in a federal habeas proceeding. *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203 (1982). The habeas statute provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). A habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999). Typically, this means that federal habeas claims must have been included in both the petitioner's appeal to the state's intermediate appellate court and in an application for permission to appeal to the state's highest court. *Id.*, 526 U.S. at 848, 119 S. Ct. at 1734. Failure to exhaust may be excused, however, if the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005) (citations omitted).

Respondent contends that petitioner failed to exhaust his judicial remedies as to his claim concerning the denial of an adjournment of trial. In that regard, although respondent admits that petitioner raised the issue in his direct appeal, he contends that "[t]he appeal raised only state issues and did not raise U.S. Constitution, U.S. laws or U.S. treaty issues." Resp. Memo of Law [#9] p. 9. However, the Court disagrees. The

Second Circuit has stated that

> an application for review will preserve an issue if the nature or
> presentation of the claim was likely to alert the court to the claim's federal
> nature.  Of course, citing a specific constitutional provision alerts state
> courts of the nature of the claim.  Such specificity, however, while
> sufficient, is not necessary.

*Ramirez v. Attorney General of State of New York*, 280 F.3d 87, 94 -95 (2d Cir. 2001)

(citations and internal quotations omitted); *see also, Id.* at 95 (Noting that an appellant

may sufficiently alert a state court that he is raising a federal constitutional issue by

including an "allegation of a pattern of facts that is well within the mainstream of

constitutional litigation."); *see also, St. Helen v. Senkowski*, 374 F.3d 181, 182 -183 (2d

Cir. 2004) ("To satisfy the exhaustion requirement of 28 U.S.C. § 2254(b), a petitioner

must "alert the state court to the constitutional nature of a claim but need not refer to

chapter and verse of the U.S. Constitution.") (citation and internal quotation marks

omitted).  Here, in his appeal brief to the Appellate Division, Fourth Department,

petitioner described the events leading up to the trial, and alleged that the denial of his

request for a continuance violated his "constitutional right to be tried fairly." Appellant's

Brief p. 17.  Moreover, in affirming the conviction, the Appellate Division, Fourth

Department, cited, *inter alia*, the case of *People v. Snyder*, 297 N.Y. 81 (1947), which

based its ruling, in part, on two U.S. Supreme Court cases, *Glasser v. U.S.*, 315 U.S.

60, 71 (1942) and *Powell v. State of Ala.*, 287 U.S. 45, 59, 53 S.Ct. 55, 60 (1932).  The

federal nature of the claim was also fairly raised in petitioner's *pro se* application

pursuant to CPL § 440.10, wherein petitioner specifically referred to the 6th and 14th

Amendments to the United States Constitution. *See*, *Pro se* CPL 440.10 Application, ¶ ¶

3-6, 29-33.  Accordingly, the Court finds that petitioner exhausted his claim regarding the denial of his request for an adjournment of the trial.  Respondent does not dispute that petitioner exhausted his other claims, alleging ineffective assistance of trial counsel and appellate counsel.  In any event, the Court finds that they were exhausted, in connection with petitioner's CPL § 440.10 application and his application for writ of error coram nobis, respectively.  The Court will now consider the merits of petitioner's claims.

Right to a Fair Trial

Petitioner contends that the trial court deprived him of a fair trial, in violation of the Sixth and Fourteenth Amendments, when it refused to adjourn the trial.  Specifically, petitioner contends that an adjournment was necessary to allow defense counsel to interview additional potential witnesses.  It is well settled that the decision whether to grant or deny a continuance "is a matter traditionally within the discretion of the trial judge," and that "[o]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the Constitution." *Drake v. Portuondo*, 321 F.3d 338, 344 (2d Cir. 2003) (citations and internal quotation marks omitted).  To establish a constitutional violation, a petitioner must establish both arbitrariness and prejudice. *U.S. v. Arena*, 180 F.3d 380, 397 (2d Cir. 1999).

The Court finds that Judge Noonan's decision in this regard was not arbitrary.  Judge Noonan considered the fact that the case had been pending for six months, and that it was the oldest criminal case on his docket at the time.  He also considered the fact that defense counsel had been given over six months to investigate and prepare a defense.  As to that, Judge Noonan further noted that the investigation of the defense case was essentially complete, except for one or two witnesses that could not be

located.  Specifically, Judge Noonan found, *based upon Horton's representations*, that there were only "one or two witnesses that [the defense was] having difficulty locating . . . which is not uncommon when you're looking for a large number of people."  Judge Noonan also considered that there was evidence that petitioner was intentionally trying to delay the trial.  Accordingly, the Court finds that the decision to deny a continuance was not arbitrary.

Nor does the record show that Judge Noonan's ruling was prejudicial to petitioner.  As discussed above, petitioner's specific request to Judge Noonan was that his trial be adjourned for approximately one month, from September 17, 1997, until after the Cole trial, which was scheduled for October 6, 1997.  Petitioner contends that a continuance was necessary to allow defense counsel to further investigate alibi witnesses.  Petitioner, in conclusory fashion, referred to the need to interview some twenty-nine[13] potential witnesses. *See, e.g.*, Respondent's Answer [#6] Ex. 3, Appellant's Brief to Appellate Div. Fourth Dept., p. 17.  However, that number was never substantiated, and as mentioned above, Horton indicated that there were only one or two witnesses that could not be located.  The specific persons whom petitioner identified as potential witnesses were Shaquima Murphy, Harvey Lockhart, Amanda Gillett, Leland Marsceill, Anthony Largent, Kelvin Robinson, and Bonnie Reed.  The denial of the continuance clearly had no effect on the defense's ability to interview Murphy, Lockhart, Gillett, or Reed, since they were interviewed by the defense prior to trial.  There is also no reason to believe that a continuance of a few weeks would have

---

[13]In his direct appeal, petitioner referred to twenty-nine witnesses.  In his initial motion pursuant to CPL § 440, petitioner referred to thirty-three witnesses.

mattered with regard to locating Leland Marsceill or Anthony Largent, since, despite the passage of years, neither petitioner nor his various counsel had ever been able to locate these individuals for purposes of bringing them to court.[14]  Lastly, no prejudice resulted from any failure to locate Kelvin Robinson prior to trial, since, as mentioned above and discussed further below, Robinson could not establish an alibi for petitioner.

Effective Assistance of Counsel

Claims for ineffective assistance of counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).  It is well settled that

> *Strickland* 's test for ineffective assistance of counsel consists of two separate prongs, both of which must be satisfied in order to establish a constitutional violation. A defendant must show both (1) that defense counsel's performance "fell below an objective standard of reasonableness ... under prevailing professional norms" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Davis v. Greiner*, 2005 WL 2500690 at *5 (Citing Strickland, 466 U.S. at 688, 694).  A substantial showing must be made on both of the two *Strickland* prongs. *Id*.  When assessing the objective reasonableness of counsel's conduct under the first prong of the *Strickland* test, the court must "consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from counsel's point of view," and must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at *6.  With regard to the second prong of the *Strickland* test,

[t]he burden is on the defendant to show that there is a reasonable

---

[14]Although petitioner obtained an affidavit purportedly executed by Largent on February 16, 1999, neither petitioner nor any of his various attorneys was ever able to locate Largent to have him testify.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  The level of prejudice [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case.

*Id*. at *8.

Looking first at petitioner's claim concerning the effectiveness of his trial counsel, the Court finds that trial counsel's performance was objectively reasonable.  In that regard, the Court must treat as presumptively correct Judge Noonan's finding that, "the Public Defender's Office diligently followed up in each and every instance on the witnesses suggested by the defendant."  Petitioner has not come forward with any evidence, let alone clear and convincing evidence, to rebut that factual finding.  Rather, the record supports Judge Noonan's finding in this regard.

Petitioner also contends that his trial counsel was ineffective because he failed to introduce evidence that CM lied to the police about contracting a sexually transmitted disease from petitioner.  Petitioner contends that CM's medical records show "nothing of such injury." Pet. Memo [#10] p. 4, n. 3.  However, as discussed above, CM's medical records do not establish that she lied to the police about having a sexually transmitted disease.  Although the lab reports were negative, the doctor's notes appear to attribute this to a "poor sample."  Rather, the physician indicated that CM had a pelvic inflammatory disease, and treated her with medication.  Accordingly, the Court finds that petitioner's claim that CM had no sexually transmitted disease is without a factual basis.  Moreover, CM's negative lab results were not issued until March 17, 1997, while her physician informed her that she had pelvic inflammatory disease two days earlier, on March 15, 1997, the same day that CM spoke to the police.  Consequently, the test

results do not indicate any dishonesty by CM, and trial counsel was not ineffective for failing to raise the issue during the trial.

The Court will now consider petitioner's claim that his appellate counsel was ineffective for failing argue on appeal that Judge Noonan's rape shield ruling was erroneous.  In that regard, the standard to be applied is the *Strickland* standard discussed above. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  Moreover, when evaluating the performance of appellate counsel,

> it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.  However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.
>
> ***
>
> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

*Id.* at 533 (*quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1985)).

Petitioner contends that his appellate counsel was ineffective for failing to argue that Judge Noonan erred by excluding evidence that BB had made prior complaints of sexual assault.  However, it is well settled that evidence of a prior complaint of sexual assault is properly excluded where there is no evidence that the prior complaint was false:

> We reject defendant's contention that Supreme Court abused its discretion in precluding cross-examination of the complainant concerning a prior allegation of sexual abuse against her father. Evidence of a victim's prior complaint of a sex crime does not come within the proscriptive scope

of CPL 60.42; therefore, its admissibility rests within the discretion of the trial court. The preclusion of such questioning does not constitute an abuse of discretion where, as here, defendant made no showing that the prior allegation was false.

*People v. Smith*, 281 A.D.2d 957, 958, 722 N.Y.S.2d 850 (4th Dep. 2001) (internal quotation marks omitted), *lv. to appeal den.* 96 N.Y.2d 868, 730 N.Y.S.2d 43 (2001); *see also*, *People v. Hill*, 17 A.D.3d 1081, 1082, 793 N.Y.S.2d 800 (4th Dep. 2005) ("Evidence that the victim had made prior accusations of sexual molestation against other members of her family was properly excluded by the court. Defendant failed to establish that the prior accusations of sexual molestation were false or suggestive of a pattern that casts doubt on the validity of, or bore a significant probative relation to, the instant charges.").  In the instant case, Judge Noonan found no evidence that the prior complaints were false.  Petitioner's trial counsel had no good-faith basis to believe that the prior complaint was false, rather, he only knew that no one was prosecuted as a result of the complaint.[15] *Compare with, People v. Harris*, 151 A.D.2d 981, 982 542 N.Y.S.2d 71 (4th Dept. 1989) ("We conclude that it was an abuse of discretion to prohibit inquiry into the complainant's prior rape complaints. Defendant offered sufficient proof, in the form of complainant's conflicting statements to hospital personnel and to the prosecutor, to demonstrate a good faith basis for inquiring whether the previous rape complaints were in fact false."); *People v. Bridgeland*, 19 A.D.3d 1122, 796 N.Y.S.2d 768, 770 (4th Dept. 2005) (Holding that proof of prior complaints should have been

---

[15]*See, e.g.*, State v. Leggett  164 Vt. 599, 600, 664 A.2d 271, 272 (Vt.1995) ("Defendant's only offer of proof was the police report, but without more, the mere fact that the allegation was not prosecuted does not show that the allegation was false.").

allowed where defendant came forward with specific proof, such as conflicting statements, suggesting that prior complaints were false).  Consequently, the Court finds that the argument urged by petitioner would not have been a viable one to raise on appeal, nor was it clearly stronger than the issues that appellate counsel raised.  Consequently, there was nothing improper about appellate counsel's decision to forego making the argument, and petitioner's claim of ineffective assistance of appellate counsel is denied.[16]

CONCLUSION

Petitioner's application for a writ of habeas corpus is denied, and the petition is dismissed.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated: Rochester, New York
        October 26, 2005

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[16]As a final observation in connection with the foregoing claims of ineffective assistance of counsel, the Court believes that petitioner's complaints should be viewed with an eye to that fact that he was an exceptionally difficult, abrasive, and ungrateful client, who constantly criticized, berated, and second-guessed his counsel in open court.  In this regard, the Court would strongly urge any reviewing court to read the transcripts of the CPL § 440 hearing in their entirety.